UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DANIELLE ROSENFELD and VINCENT GARCIA, on behalf of themselves and all others similarly situated,

        Plaintiffs,

  -against-

TARA LENICH; CITY OF NEW YORK; LU-SHAWN M. THOMPSON, AS ADMINISTRATOR OF ESTATE OF KENNETH P. THOMPSON; ERIC GONZALEZ; MARK FELDMAN; WILLIAM SCHAEFER; BRIAN DONOHUE; WILLIAM POWER; MICHAEL DOWLING; JOSEPH PIRAINO; and ROBERT KENAVAN,

        Defendants.

---

No. 18 Civ. 6720 (NGG)(PK)

**DECLARATION OF RICHARD D. EMERY**

RICHARD D. EMERY, an attorney duly admitted to practice before this Court and the courts of the State of New York, declares the following to be true under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am a partner in the firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP ("ECBAWM"). Along with our co-counsel, Wiggin & Dana LLP ("Wiggin"), we represent Plaintiffs Danielle Rosenfeld, Vincent Garcia, and the conditionally certified settlement class. I submit this Declaration in support of Plaintiffs' motion for final approval of their settlement with the City of New York, Lu-Shawn M. Thompson, Eric Gonzalez, Mark Feldman, William Schaefer, Brian Donohue, William Power, Michael Dowling, Joseph Piraino, and Robert Kenavan (collectively, the "City Defendants").

1

2.     A proposed Final Approval Order is attached as Exhibit 1. Because the proposed

settlement satisfies all of the criteria for final approval, the parties respectfully request that the

Court:

 a.  approve the August 7, 2020 Settlement Agreement, Exhibit 2;

 b.  confirm its certification of the settlement class, for the reasons stated in the

     preliminary approval submission;

 c.  confirm its appointment of ECBAWM and Wiggin as class counsel for the

     settlement class for the reasons stated in the preliminary approval submission;

 d.  approve a service award for Named Plaintiffs Danielle Rosenfeld and Vincent

     Garcia of $15,000 each; and

 e.  approve Class Counsel's request for attorneys' fees in the amount of

     $1,066,666.66 and costs in the amount of $31,655.20.

**Discovery in *Rosenfeld I***

3.     On December 14, 2017, ECBAWM filed a lawsuit on behalf of Stephanie

Rosenfeld against Tara Lenich. *See Rosenfeld v. Lenich*, No. 17 Civ. 7299 (NGG)(PK)

(E.D.N.Y.) ("*Rosenfeld I*"), Dkt. 1. On February 1, 2018, ECBAWM filed an amended complaint

on behalf of Stephanie Rosenfeld, naming the City of New York ("City") and certain Kings

County District Attorney's Office ("KCDA") supervisors as additional defendants. *Id.* Dkt. 11.

4.     On May 24, 2018, the Court held a conference in *Rosenfeld I*. At that conference,

I told the Court that the wiretaps of Stephanie Rosenfeld and Jarrett Lemieux captured not only

their communications with one another, but also their communications with "literally hundreds

of other people." Dkt. 95-4 (Tr. of Pre-Motion Conf., dated May 24, 2018) at 9. I went on to

explain that these hundreds of people "are unknown, unnamed victims of these wiretaps who

themselves have damage claims, statutory damage claims, for being wiretapped," and that the

statute of limitations on those claims was going to run in November 2018. *Id.* I therefore

requested that the Court allow immediate discovery to determine the identities of the other

victims of the wiretaps.

5.      The Court agreed that discovery was appropriate. "[F]or the purpose of

identifying other potential victims," the Court stated, "I think it would be appropriate to have

some limited discovery." *Id.* at 14-15; *see also id.* at 12 ("limited discovery might be necessary

to unearth the potential victims of this activity").

6.      On August 16, 2018, Judge Kuo ordered the City to disclose all the phone

numbers with which Stephanie Rosenfeld was communicating while her communications were

being unlawfully intercepted. *See Rosenfeld I*, Dkt. 70 ¶ 1. The City disclosed this information to

ECBAWM in September 2018.

7.      From this initial disclosure, ECBAWM determined that there were approximately

150 unique phone numbers with which Stephanie Rosenfeld was communicating while her

communications were being unlawfully intercepted.

8.      At that stage, ECBAWM still did not have the data that was intercepted from

Jarrett Lemieux's communications to determine how many unique numbers he had been

communicating with during the illegal wiretap.

**Filing the Putative Class Action and Preserving the Statute of Limitations for the Putative Class**

9.      In or around late October 2018, I had a meeting with James I. Glasser and Tadhg

Dooley, attorneys with Wiggin, along with my colleagues Samuel Shapiro and Jessica Clarke.

10.     The Wiggin attorneys, who were representing Jarrett Lemieux, told us they had examined Det. Lemieux's phone records and determined that he had communicated with hundreds of unique phone numbers while the illegal wiretap was in place.

11.     Seeing that none of these victims of the wiretap had come forward to assert their rights under the Wiretap Act, and recognizing that the statute of limitations on their claims would expire on November 28, 2018, ECBAWM and Wiggin jointly decided to pursue a putative class action to seek compensation for these victims.

12.     Danielle Rosenfeld and Vincent Garcia (the "Named Plaintiffs") retained ECBAWM and Wiggin on a contingency fee basis to represent them as named plaintiffs in a putative class action against Lenich and the City Defendants.

13.     On November 26, 2018, one day before the statute of limitations expired, ECBAWM and Wiggin filed a putative class action on behalf of Danielle Rosenfeld, Vincent Garcia, and all other victims of the illegal wiretap (except Stephanie Rosenfeld and Det. Lemieux). The complaint alleged violations of the Wiretap Act against Lenich, the City, and several KCDA supervisors. *See* Dkt. 1.

14.     On March 4, 2019, the City Defendants served a motion to dismiss Plaintiffs' complaint. *See* Dkt. 46. The motion raised substantial questions of law about Plaintiffs' ability to recover from the City under the Wiretap Act. Plaintiffs opposed the motion. Because the City Defendants briefed substantial issues regarding municipal liability in their reply, filed April 15, 2019, Class Counsel were compelled to file a surreply memorandum addressing these arguments on April 25, 2019. *See* Dkt. 56, 62. Class Counsel also began preparing for the possibility of an immediate appeal even if this Court denied the City Defendants' motion. To date, the Court has not ruled on the merits of the City Defendants' motion.

15.     Also on March 4, 2019, Lenich filed a motion to strike the class allegations. *See*

Dkt. 57. Plaintiffs opposed that motion as well.

16.     While the City Defendants' motions were pending, the parties exchanged

substantial written discovery. Between May 20, 2019, and July 22, 2019, the City Defendants

produced 8,310 pages of documents, Lenich produced 196 pages of documents, and Named

Plaintiffs produced 105 pages of documents. This discovery did not reveal any "smoking gun"

that would definitively establish the City Defendants liability and/or justify punitive damages.

**History of Settlement Negotiations**

17.     On July 30, 2019, the parties held a settlement conference with Judge Kuo.

Plaintiffs demanded $7,000,000, which corresponded to the full $10,000 in statutory damages for

each of the approximately 700 class members Plaintiffs believed at the time comprised the class,

based on an analysis of phone bills of Stephanie Rosenfeld and Jarett Lemieux.

18.     The City Defendants responded with an offer of $150,000.

19.     Plaintiffs refused to lower their demand, and the City Defendants were ultimately

only willing to increase their offer to $250,000. Plaintiffs' demand remained at $7,000,000,

though they acknowledged that it would be lowered if it was determined that the class was

actually smaller than Named Plaintiffs believed.

20.     Following the settlement conference, the parties continued to engage in settlement

discussions. Among other things, the parties consulted with an expert in the software the KCDA

uses to store data collected from its wiretaps, the ADACS system. The metadata from the illegal

wiretaps that the City had produced came from the ADACS system and showed approximately

351 unique phone numbers and numerous numbers that were something other than standard ten-

digit United States phone numbers. The parties sought the expert's assistance to better understand the metadata the City had produced.

21.     The expert explained that Lenich's wiretap likely did not run 24 hours per day, and that many of the phone numbers that appeared in Jarret Lemieux's and Stephanie Rosenfeld's phone records were not in fact intercepted by the wiretap.

22.     ECBAWM and Wiggin also consulted with other individuals who are familiar with the data that is typically stored by law enforcement officials during a wiretap.

23.     After these conversations, the parties determined that communications to and from 351 unique phone numbers (not including Stephanie Rosenfeld and Det. Lemieux) were intercepted during the course of the illegal wiretap. The parties also determined that no phone number was intercepted on more than 100 days. In light of this information, Named Plaintiffs adjusted their valuation of the Class claims, recognizing that the size of the Class was about half of what they had originally believed.

24.     While these settlement conversations were ongoing, the parties continued to exchange discovery. Plaintiffs continued pressing for electronic discovery, including emails, which the City Defendants were very slow to produce.

25.     On November 14, 2019, Plaintiffs filed a motion to compel the production of the City Defendants' electronically stored information. *See* Dkt. 74. Judge Kuo ultimately ordered the City Defendants to produce responsive electronically stored information on or before February 18, 2020. *See* Minute Entry (Dec. 13, 2019).

26.     On January 8, 2020, the Named Plaintiffs entered into a settlement agreement with Lenich to resolve their claims against her.

27.     Lenich, through counsel, had repeatedly claimed that she did not have the means to satisfy any significant judgment against her.

28.     Named Plaintiffs, in consultation with ECBAWM and Wiggin, therefore concluded that a detailed declaration from Lenich would be more helpful to the putative class than continuing to pursue claims against an empty pocket.

29.     Following significant negotiations, Lenich produced a truthful declaration, explaining how she was able to conduct her illegal wiretapping scheme, the significant authority she had within the KCDA, and how the City Defendants did not have any meaningful supervision or control over wiretaps at KCDA or KCDA's wiretap room.

30.     After Lenich's declaration was produced, and with the City Defendants' February 18, 2020 deadline to produce electronically stored information looming, Plaintiffs and the City Defendants re-engaged in serious settlement discussions.

31.     An agreement in principle was reached on February 14, 2020.

32.     Due to the coronavirus pandemic, it took several months for the parties to iron out the details of their agreement, including the notice provisions, and the administration of the settlement.

33.     On August 7, 2020, the Named Plaintiffs and the City Defendants executed a Settlement Agreement to finalize and memorialize their settlement ("the Settlement").

34.     In early September 2020, counsel for the City Defendants informed Class Counsel that they had served notices advising of the proposed Settlement on state and federal authorities entitled to receive such notice under the Class Action Fairness Act, 28 U.S.C. § 1715.

35.     On February 4, 2021, this Court issued an Order preliminarily approving the Settlement, directing notice to class members, and scheduling a fairness hearing for September

23, 2021. *See* Dkt. 97-1. "Taking into account both the procedural and substantive factors set forth in Federal Rule of Civil Procedure 23(e)(2), as well as the *Grinnell* factors, the court conclude[d] that it will likely be able to approve the parties' proposed settlement agreement as fair, reasonable, and adequate." *Rosenfeld v. Lenich*, No. 18 Civ. 6720, 2021 WL 508339, at *4 (E.D.N.Y. Feb. 11, 2021) ("*Preliminary Approval Opinion*"). The Court determined that the Settlement should be preliminarily approved because, among other reasons, "litigating this case to a final judgment would likely take years, require several rounds of motion practice and extensive discovery, and require both parties to expend considerable time and resources, and Plaintiffs would face a substantial likelihood that the effort and expense of litigating to a final judgment would not result in any recovery." *Id.* at *5. The Court also favorably assessed the recovery provided by the Settlement, noting that "[i]n order to recover more than the settlement amount through continued litigation, at least 320 separate plaintiffs—more than 90% of the total class, and perhaps close to or more than 100% of the total class—would need to successfully recover the maximum statutory damages. *Id.* at *7.

**Administration and Allocation of the Settlement Fund**

36.      The Settlement requires the City Defendants to pay $3.2 million to create a settlement fund, which will be used to pay class member awards, attorneys' fees and costs, and administrative costs (the "Class Fund").

37.      Each class member's award will be determined by the number of times his or her communications were intercepted. Class members whose communications were intercepted 1 time will be entitled to 6 Award Units; class members whose communications were intercepted between 2 and 10 times will receive 7.5 Award Units; class members whose communications were intercepted between 11 and 100 times will receive 10 Award Units; and class members

whose communications were intercepted more than 100 times will receive 15 Award Units.

Each Award Unit will have an equal monetary value, determined by dividing the Net Settlement

Amount (calculated and defined as the total Settlement Fund ($3.2 million less Administrative

Costs, Attorneys' Fees, and Incentive Awards) by the total number of Award Units (calculated

based on the total number of interceptions of eligible claiming class members)), except that the

value of an Award Unit may not exceed $1,000.

38.     Pursuant to this Court's approval, Class Counsel retained RG/2 Claims

Administration LLC ("RG/2"), which has extensive experience administering class action

agreements, to serve as the Settlement Claims Administrator. The costs incurred by RG/2 in

administering the Settlement ("Administrative Costs") will be paid for out of the Settlement

Fund, in accordance with the terms of the settlement agreement and this Court's Preliminary

Approval Order. *See* Dkt. 97-1 ¶ 19. RG/2 estimates that the Administrative Costs will not

exceed $50,000.

39.     Beginning on February 12, 2021, Class Counsel provided RG/2 with Class

Member contact information obtained from the Named Plaintiffs, Stephanie Rosenfeld, and

Jarett Lemieux. Beginning on February 26, 2021, Counsel for City Defendants provided RG/2

with names and contact information for Class Members assigned to phone numbers owned by the

City of New York, including KCDA. Counsel for the Parties provided RG/2 with additional

contact information for Class Members over the next month.

40.     On March 22, 2021, the Court granted Plaintiffs' request for an extension of the

deadline to mail notices and claim forms from March 21, 2021 to March 25, 2021 and an

extension of the deadline for class members to submit claim forms from June 19, 2021 to June

23, 2021. *See* Dkt. 103.

41.     The declaration of Dana Boub, a Project Manager of Claims Administration for

RG/2, details the work done by RG/2, including identifying contact information for class

members; sending notices, claim forms, and reminder text messages to the class; responding to

class member inquiries; operating a class website; and accepting and processing claim forms.

42.     Notice was provided to the Class consistent with the Court's Preliminary

Approval Order. As the Court found, these "methods of identifying class members and providing

them with notice of the settlement, taken together, are robust and well-suited to the unique

circumstances of this case." *Preliminary Approval Opinion*, at *11.

43.     The Parties and RG/2 identified 331 total Class Members from the metadata. All

331 Class Members have been provided at least one form of Notice.

44.     As stated in the RG/2 declaration from Ms. Boub, RG/2 and counsel for the

Defendants originally identified 286 Class Members (the "Original Class Members"). Notice and

Claim Form packages were mailed to 230 of these Class Members on March 25, 2021, and text

messages containing a link to the Notice and Claim Form were sent to all 286 Original Class

Members the same day.

45.     After making phone calls to all 286 Original Class Members, RG/2 identified 39

Original Class Members for whom they had been unable to identify names and mailing addresses

through reverse lookups and skip tracing efforts and whose phone numbers were non-working or

non-responsive (the "Non-Responsive Numbers"). The parties agreed to issue subpoenas to

telephone service providers seeking the names, mailing addresses, email addresses, and phone

numbers associated with these Non-Responsive Numbers.

46.     Counsel for Plaintiffs issued a total of 14 subpoenas seeking class member

information. On May 3, 2021, Counsel for Plaintiffs issued subpoenas to Verizon, T-Mobile,

Sprint, Spectrum, Optimum, and AT&T. Responses to these subpoenas identified an additional

eight telephone companies as service providers for some of the Non-Responsive Numbers:

Bandwidth, Cablevision, Level 3 Communications, Local Access, Mosaic, Onvoy, Peerless, and

U.S. Telepacific. Counsel for Plaintiffs issued subpoenas to these companies on May 27, 2021.

Responses to these subpoenas helped identify the names and addresses of an additional seven

Class Members, to whom Notice was subsequently sent.

   47. In July 2021, counsel for Plaintiffs identified an additional 45 Class Members

who were not included among the Original Class Members. Originally, interceptions listed in the

Metadata as being associated with unanswered phone calls had been excluded from the class list

on the theory that, because these phone calls were unanswered, no communications were in fact

intercepted. But, during the administration process, counsel for Plaintiffs identified a number of

phone numbers in the metadata that were associated with unanswered phone calls of a nonzero

call duration. Counsel for Plaintiffs and Defendants conferred and determined these unanswered

phone calls of a nonzero duration represented voicemails. After further investigation, Counsel for

Plaintiffs and Defendants identified a list of phone numbers whose voicemails had been

intercepted and recorded by the ADACS system. The parties agreed that this constituted an

"Interception" as defined in the Agreement. By cross-referencing various records provided by

Counsel for City Defendants and the current class list as provided by RG/2, Class Counsel then

identified 45 phone numbers whose voicemails had been intercepted and recorded by the

ADACS system but that had not been previously identified as Class Members (the "Voicemail

Class Members"). The Parties agreed to send late notice to the Voicemail Class Members, as

permitted by the Settlement Agreement. *See* Ex. 2 ¶ 70.

48.     There are 331 Class Members total, including the Original Class Members and the Voicemail Class Members.

49.     RG/2 sent text messages with a link to the Notice and Claim Form to all 45 Voicemail Class Members on July 23, 2021. RG/2 also mailed Notice and Claim forms to 18 of the Voicemail Class Members whose mailing addresses could be identified. Under the terms of the settlement agreement, because these individuals were identified or located forty-five days prior to the Bar Date or later, the Voicemail Class Members have forty-five days from the date the Notice and Claim Form is sent, or until September 6, 2021, to submit a Claim Form. To date, 10 Voicemail Class Members have submitted valid claim forms. *See* Boub Decl. ¶ 23. In the event that the 36 remaining Voicemail Class Members file a valid claim form by September 6, 2021, they would be eligible for a combined maximum award of $268,0000. *Id.*

50.     As detailed further in Ms. Boub's declaration, as of August 20, 2021, 159 Class Members have submitted claim forms. *Id.* ¶ 22. This represents 48% of all 331 Class Members, including the 35 Voicemail Class Members who have yet to submit a claim and who have until September 6, 2021, to do so.

51.     RG/2 has calculated that, based on claim forms submitted to date, each Award Unit will have a value of $1,000. If all outstanding Voicemail Class Members submit valid claim forms, each Award Unit will continue to have a maximum value of $1,000. *See* Boub Decl. ¶ 24. When calculated with the maximum $1,000 Award Unit, the claims submitted to date represent a total payout of $1,268,500, including the anticipated service awards of $15,000 to each Named Plaintiff. *Id.* ¶ 22.

52.     Based on these calculations, the Class will receive a total award of between

$1,268,500 (if no more valid claims are filed) and $1,536,500 (if all Voicemail Class Members

submit valid claims). *See id.* ¶¶ 22-23.

53.     As detailed in Ms. Boub's declaration, to date, no Class Member has opted out

from or objected to the Settlement. *See id.* ¶¶ 14-15.

**Attorneys' Fees and Costs**

54.     ECBAWM and Wiggin seek an award of attorneys' fees in the amount of

$1,066,666.66, representing one-third of the total Class Fund, as well as costs in an amount of

$31,655.20, to be paid from the Class Fund. As indicated in the below chart ECBAWM's costs

include filing fees, service of process, discovery storage, courier services, and legal research. All

of these costs were reasonable, necessary, and actually incurred.

**ECBAWM Costs**

| Category | Amount |
|---|---|
| Discovery Management | $    12,328.65 |
| Legal Research | $      5,418.00 |
| Process Server | $      2,750.00 |
| Court Reporter | $      1,085.02 |
| Filing Fee | $        400.00 |
| Courier | $        115.62 |
| Records | $          81.00 |
| | $    22,178.29 |

55.     The $1,066,666.66 in attorneys' fees sought by Class Counsel represents

approximately 109% of the combined current lodestar for Class Counsel, which is currently

$976,071.50. As indicated in the below chart, the current lodestar for ECBAWM is $592,936.50.

As detailed in the accompanying Wiggin declaration, the current lodestar for Wiggin is

$383,135.00. While Class Counsel litigated this case on a contingency basis, the hourly attorney

rates used in calculating the lodestars for ECBAWM and Wiggin are current rates the firms

charge clients who pay hourly. The rates used by all counsel are also in line with prevailing

market rates.

**Calculated Lodestar for ECBAWM**

| Individual | Rate | | Hours | Lodestar | |
|---|---|---|---|---|---|
| Matthew D. Brinckerhoff | $ | 775.00 | 0.30 | $ | 232.50 |
| Richard Emery | $ | 900.00 | 310.40 | $ | 279,360.00 |
| Debbie Greenberger | $ | 550.00 | 2.50 | $ | 1,375.00 |
| Elizabeth Saylor | $ | 600.00 | 2.10 | $ | 1,260.00 |
| Sam Shapiro | $ | 500.00 | 286.70 | $ | 143,350.00 |
| Zoe Salzman | $ | 500.00 | 0.60 | $ | 300.00 |
| Ashok Chandran | $ | 425.00 | 0.40 | $ | 170.00 |
| Andrew Jondahl | $ | 425.00 | 2.30 | $ | 977.50 |
| David Berman | $ | 425.00 | 1.00 | $ | 425.00 |
| Emma Freeman | $ | 450.00 | 0.90 | $ | 405.00 |
| Jessica Clarke | $ | 450.00 | 96.30 | $ | 43,335.00 |
| Marissa Benavides | $ | 400.00 | 0.60 | $ | 240.00 |
| Michele Yankson | $ | 425.00 | 8.10 | $ | 3,442.50 |
| Scout Katovich | $ | 400.00 | 252.20 | $ | 100,920.00 |
| Summer Associate | $ | 260.00 | 21.70 | $ | 5,642.00 |
| Paralegals | $ | 180.00 | 63.90 | $ | 11,502.00 |
| **Total** | | | 1,050 | $ | 592,936.50 |

56.     As the Court noted in its Opinion preliminarily approving the Settlement,

"Plaintiffs' attorneys are well regarded and highly capable, and they have demonstrated

throughout this litigation that they are competent to represent the class. Crucially, they preserved

the putative class members' claims, which would have otherwise expired, by initiating this action

just before the end of the applicable statute of limitations. Both Emery Celli and Wiggins have a

14

wealth of experience handling complex class actions, and their attorneys on this case have a wealth of relevant experience." *Preliminary Approval Opinion*, 2021 WL 508339, at *5.

57. The ECBAWM lawyers assigned to this matter are experienced litigators well-versed in class action practice. I am a founding partner of ECBAWM and possess decades of experience representing institutions and individuals in commercial, civil rights, and civil liberties actions, including class actions. I have served as lead counsel on several class-action lawsuits, including *McBean v. City of N.Y.*, 260 F.R.D. 120 (S.D.N.Y. 2009). Prior to founding ECBAWM, while a partner at Lankenau Kovner & Bickford, I successfully challenged the structure of the New York City Board of Estimate under the one-person, one-vote doctrine, arguing in the U.S. Supreme Court and resulting in the unanimous invalidation of the Board on constitutional grounds. Before then, I was a staff attorney at the New York Civil Liberties Union and director of the Institutional Legal Services Project in Washington state, which represented persons held in juvenile, prison, and mental health facilities. I graduated from Columbia Law School in 1970 and served as a law clerk for the Honorable Gus J. Solomon of the U.S. District Court for the District of Oregon.

58. The other attorneys on this matter are also highly qualified. Samuel Shapiro, a partner at ECBAWM, graduated from Georgetown University Law Center in 2008 and has spent a decade at the firm litigating a variety of civil rights cases and commercial matters. Mr. Shapiro has served as counsel on class action and FLSA collective action lawsuits, including *Nunez v. City of N.Y.*, No. 11 Civ. 5845 (S.D.N.Y.). Jessica Clarke, formerly Of Counsel at ECBAWM currently serves as the Chief of the Civil Rights Bureau in the Office of the New York State Attorney General. Ms. Clarke graduated Ohio State University's Moritz College of Law in 2008 and has over a decade of experience litigating complex commercial and civil rights matters,

including as a Trial Attorney in the U.S. Department of Justice, Civil Rights Division prior to joining ECBAWM. Scout Katovich, an Associate at ECBAWM, graduated from Yale Law School in 2017. Prior to joining ECBAWM, Ms. Katovich clerked for the Honorable Denise L. Cote in the Southern District of New York and was a legal fellow at the New York Civil Liberties Union, where she served as counsel on two certified class action lawsuits. *Abdi v. Duke*, 323 F.R.D. 131, 136 (W.D.N.Y. 2017) (certifying class of detained asylum seekers challenging parole and bond procedures); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 615 (S.D.N.Y. 2018) (certifying class of unaccompanied minor children in Office of Refugee Resettlement (ORR) custody in New York State challenging ORR release policies).

**Service Awards**

59.     Named Plaintiffs Vincent Garcia and Danielle Rosenfeld have expressed their approval of the settlement by agreeing to the settlement agreement.

60.     In accordance with the settlement agreement, Plaintiffs request that the Court approve service awards for the Named Plaintiffs in the amount of $15,000 each, in recognition of the services they rendered on behalf of the class.

61.     Named Plaintiffs contributed significant time and effort to the investigation and prosecution of the case by providing Class Counsel with detailed factual information regarding their experiences with Defendants' unlawful interception of their communications. As part of discovery in this case, Named Plaintiffs searched for documents responsive to document requests and responded to interrogatories. Named Plaintiffs were also involved with the settlement negotiations and made themselves readily available to communicate with Class Counsel. As required by the Settlement Agreement, Named Plaintiffs also made themselves available to assist with the identification of Class Members. *See* Ex. 2 ¶¶ 37, 48. The time and effort contributed by

16

the Named Plaintiffs for the benefit of the class and the additional burdens they sustained support

the requested service award.

62.     Named Plaintiffs both cooperated in the discovery process in this case, including

by searching for and providing documents to counsel and providing counsel with information

that, had the case proceeded, would have been provided to Defendants in discovery. Named

Plaintiffs were also prepared to participate in depositions, which likely would have involved

answering a range of personal questions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 23, 2021
        New York, New York

                                        _____/s_____
                                        RICHARD D. EMERY